```
         IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

            MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


RUTH LYNN DEPUTY,             )
                              )
    Plaintiff,                )
                              )
    v.                        )    CIVIL ACTION NO.
                              )      2:02cv1401-T
COLONIAL BANK, et al.,        )         (WO)
                              )
    Defendants.               )
```

### ORDER ON PRETRIAL HEARING

A pretrial hearing was held in this case on July 20, 2005, wherein the following proceedings were held and actions taken:

1. **PARTIES AND TRIAL COUNSEL:**

    COUNSEL APPEARING AT PRETRIAL HEARING: (same as trial counsel):   For Plaintiff:    Ruth L. Deputy

    For Defendant:   Terry Price

2. **JURISDICTION AND VENUE:**

    The Court has jurisdiction and venue is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

3. **PLEADINGS:** The following pleadings and amendments were allowed:

Complaint and Answer thereto.

4. **CONTENTIONS OF THE PARTIES:**

   a. **The plaintiff:**

   i. **Ruth Deputy Plaintiff was hired at Colonial Bank Purchasing & Printing Department on March 26, 1996, as a Customer Service/Secretary, next title Administrative Assistant, next Office Manager and currently Senior Administrative Assistant III. I worked hand in hand with the Director Jim Thorne until he resigned October 4, 1999.**

   ii. **Approximately October 7, 1999 during a staff meeting Judy Mills informed the department that everyone is to report to Roy Mathews. Plaintiff, Ruth Deputy asked to meet with Judy Mills after the assembly. Plaintiff asked Judy Mills why she was not offered the Directors position, her response was "due to the graphic design degree, if I had posted the position, you would not be qualified for it. Right now, we are not filling the position; you and Roy are splitting the responsibilities." The plaintiff Ruth Deputy was given 85% of the Directors responsibilities.**

   iii. **On April 24, 2001 and April 25, 2001 Roy Mathews did not call in or report to work. On April 30, 2001 through May 4, 2001 he did not call in or report to work. This pattern in Roy's behavior was obvious to his employees whom he supervised and the department. Roy often had scheduled meetings with our vendors, and when they arrived I would apologize for his absence and assist them as needed. The staff was concerned because I had to document on payroll when they are one minute late and they acknowledge that nothing was being done about Roy.**

iv. **On May 11, 2001 I began processing payroll which was due on May 14, 2001. Roy Mathews did not inform me of the time he wanted to use for the period of April 24, 2001 through May 4, 2001. When I completed his exempt time sheet, which I had done in the past for Jim Thorne, I wrote uncompensated time for the week; he did not show up. He stated that he would call Judy Mills. He returned and said that they have decided to use vacation time.**

v. **May 14, 2001 I faxed in the payroll and went to Human Resources to talk to Vicki Hubbard the payroll supervisor, about the situation. She informed me that Judy Mills had contacted her and told her to pay Roy vacation for that time period. She requested that I call Judy Mills and if she told me to use vacation time then that is what I should do. I stressed to her that Roy did not show up for work or call in. I returned to my to contact Judy Mills. She returned my call and informed me to use 40hrs. vacation.**

vi. **I then contacted Judy Mills's supervisor Sarah Moore. She was not in the office. I explained to her secretary that I was being instructed by my supervisor Judy Mills to pay an employee vacation time when he did not show up or call in to work. Sarah Moore did not return my call.**

vii. **On May 15, 2001 Andrea McCain called me at approximately 10:30 am and asked me if I would come to her office. Upon arrival she stated "you upset Sarah Moore and Judy Mills and you don't know how much trouble you have caused by contacting Sarah Moore". During this meeting she repeatedly said, "this type of behavior will not be tolerated." I explained to Andrea that this is not the first or second time this has occurred and it is a pattern of behavior. I received a warning letter that stated in**

3

        closing "Ruth acted inappropriately by discussing the situation with Human Resources, Judy Mills, and Sarah Moore. This behavior will not be tolerated in the future." I felt threatened by Andrea's behavior and management of loosing my job if I reported anything else. Therefore, when I was faced with the discrimination because of my race and sex, in violation of Title VII of the Civil Rights Act of 1964, as amended. I elected to seek outside assistance. I filed a charge of Discrimination with the EEOC on July 9, 2002.

viii. October 22, 2001 was Roy Mathews last day of Employment with the Company. On or before November 2, 2001 Judy Mills held a staff meeting to inform the Purchasing Department that Roy Mathews was no longer with the company. Roy Mathews was terminated for abandonment. I did not receive an apology nor did Ancrea McCain retract the warning letter I received for reporting this situation.

ix. On March 1, 2002, Plaintiff Ruth Deputy received an email from Judy Mills stating in summary: she had interviewed Clifford Harris for Purchasing Director, but she did not want to make the decision by herself, she wanted me to have the opportunity to meet with him. (See Exhibit) This interview took place prior to the position being posted in house. The plaintiff was not aware that the position was available.

x. Before Craig Burkhalter's hire for the Directors position on June 24, 2002 Judy Mills instructed me to interview him. His tenure ended with the company after his 90-day evaluation.

xi. During Craig Burkhalters tenure with the Company, I trained him numerous hours per day as required by Judy Mill & Craig Burkhalter. I (Plaintiff) continued to

4

        **handle the responsibilities assigned by my supervisor Judy Mills during and after his tenure.**

xii.    **The Director's position has not been filled and as of December 2004, we no longer have a permanent employee in the Typesetting position and I am indirectly instructed to complete these tasks as needed.**

xiii.    **Judy Mills requested that the plaintiff interview applicants for the position of the Director. Per Judy Mills, Ruth Deputy was responsible for training the new Director of Purchasing & Printing, and also train Judy Mills and her new Assistant of the Operations department on the functions and the operation of the Purchasing Department. Judy Mills's office is located at One Commerce Street, Montgomery AL 36104 and the Purchasing department is located at 150 Lee Street, Montgomery AL 36106.**

xiv.    **Morris Wilson - was the Assistant Production Manager to Roy Mathews. As of January 2005 he has been working the Purchasing Department for five years.**

### <u>Altering Documents 18 U.S.C. 1001</u>

The job description for (Senior Administrative Assistant) that was sent to EEOC Title and experience required fields were altered. See Attached Job Descriptions. These false documents were used to mislead the EEOC's investigation.

Throughout the deposition the phrase "you know" was inserted 114 times. Parts of the deposition were sent to court as evidence with the defendants' Request for Summary Judgment. Mr. Middlebrook statement

"you are lying" is also missing from the deposition. I had requested a copy of the deposition on disc from the Foshee & Turner Court Reporters at the cost of $875.35. I'm requesting that the defendant reimburse me for the cost of the altered document.

The Job description for the (Director of Corporate Purchasing & Printing) Education and Experience was altered. (Docket #38 Exhibit C)

## CLOSING STATEMENT

My supervisor Judy Mills was aware of my qualifications to handle the Purchasing & Printing Department. She knew, when Jim Thorne was out of the office myself maintained it. She also felt confident that I could handle 85% of the Directors responsibilities. Since Jim Thorne departure October 4, 1999 I've been handling the director's responsibilities. Per Judy Mills (Docket #38, Exhibit 2, pg. 6, and paragraph 16 &18) I received an increase for assuming some of the duties formerly performed by Jim Thorne. That statement is false. (See Exhibit)

I was qualified to handle the responsibilities of the Director, train the new director and interview candidates for the position. Also, I was required to train Judy Mills & her Assistant Robert Banks on the functions and operations of the Purchasing & Printing Department. Yet according to Judy Mills my supervisor, whom gave me the responsibilities and human resources

response to my bid, I did not meet the minimum qualifications for the position. (Docket #38, Exhibit 2, pg. 6, paragraph 30) In summary Judy Mills determined that the plaintiff did not have the necessary experience to manage the print shop.  (Docket #38, Exhibit 2, pg. 4, paragraph 18) Judy stated that Plaintiff received this increase for the duties assigned to her. This statement is false.

Due to the altered documents and false statements made by the defendant I'm inclined to believe the Directors salary the defendants reported was false.  I continue to handle the Directors responsibilities without the Title and Salary or an increase for performing the duties of the Director. Thus far no Director has been hired.

    **b.**    **The defendant(s):**

*General Background*

1. Plaintiff began working for the Bank in 1996 in a Secretary/Customer Service position in the Purchasing Department and was promoted to her current Senior Administrative Assistant position (sometimes referred to as "Office Manager") in the Purchasing and Printing Department sometime thereafter.

2. Defendant Judy Mills is employed by the Bank as its Senior Vice President for Retail Operations.  One of the departments supervised by Mills is the Purchasing and Printing Department.

### *The Purchasing and Printing Department*

3. The Bank's Purchasing and Printing Department is responsible for printing, ordering, stocking and supplying the various bank departments and branches with the printed material needed for bank operations.

4. The Department is divided into three general areas: the Print Shop, the Warehouse and the Office (administrative).

5. The Print Shop uses raw materials to produce finished products that are needed by the Bank's branches. Printing press operators in the Print Shop actually print the material that is supplied to internal Bank clients.

6. From January 1998 until October 2001, the Print Shop was supervised by Production Manager Roy Mathews. The Production Manager's duties included "organiz[ing] workflow and manag[ing] employees of an internal printing facility while maintaining quality standards" and" analy[sis] of production requests, plan production schedules . . ." and other tasks associated with print shop operation.

7. The Warehouse stores materials until those materials are needed by the Bank. The Warehouse has been supervised by Warehouse Manager Richard Shepherd since before 1999.

8. As Senior Administrative Assistant, Plaintiff was (and is) responsible for record keeping, paperwork and other administrative functions in the Purchasing and Printing Department. Although Plaintiff supervised a secretary who assisted with the Department's administrative functions for a short period of time, she has typically been the only employee in the administrative function for the Department and she has never supervised or managed the print shop or warehouse operations nor has she ever operated the presses. The Department's administrative function is also referred to as the "office" and Plaintiff's position has been referred to as the "office manager" from time to time.

### *The Purchasing and Printing Director*

9. The Purchasing and Printing Director supervised the Department and reported to Judy Mills.

10. Until the Autumn of 1999, the Production Manager, Senior Administrative Assistant and the Warehouse Manager all reported to Jim Thorne, Printing and Purchasing Department Director. Thorne's employment with the Bank ended effective October 5, 1999. Thorne's annual salary at the time of his resignation was $45,362.70 and the Director's position is classified as a grade 10 exempt (10E) position in the Bank.

11. The Purchasing and Printing Director's responsibility is summarized as follows:

    Conduct negotiations with vendors for materials requiring commitments over extended periods to maintain an uninterrupted supply of material and services to bank branches. Establish and maintain procedures for purchasing and in-plant printing specifications. Oversee printing operations by maintaining quality standards and communications with bank departments. Ensure production employees are properly cross-trained in job duties and that all OSHA standards are met.

### *The 1999 Decision Not to Fill the Director Position is Time Barred and Should No Longer Be at Issue*

12. Rather than replace Thorne, Mills elected to divide the Director's duties among three of the remaining employees in the Department. Mills decided not to replace the Director because she believed the Department could operate effectively without a Director because she could provide direct supervision to the Department at that time.

13. According to Plaintiff, Mills told her that she and Mathews would each assume part of the Director's work after Thorne left. Plaintiff acknowledges that there was one fewer employee in the

9

      Department after Jim Thorne left the Purchasing Department. According to Plaintiff, it was a good decision to eliminate the Director's position and divide the responsibilities among the people in the Department.

14. Plaintiff, Mathews and Shepherd each assumed some of the duties that had been previously performed by Thorne. Thereafter, Plaintiff, Mathews and Shepherd, who had previously each reported to Thorne, each reported directly to Mills.

15. At her deposition, Plaintiff testified that she performed 85% of the Director's duties and that Mathews performed 15% of the Director's duties after Thorne left.

16. Mathews' job title - Production Manager - did not change after Thorne resigned.

17. Similarly, Plaintiff's job title - Senior Administrative Assistant - did not change after Thorne resigned.

18. Both Mathews and Plaintiff received a pay increase as a result of assuming some of the duties formerly performed by Thorne.

19. Effective December 27, 1999, Mathews' pay increased 20%, from $29,744/year to $35,692.80/year, and his job grade increased from 6E to 8E (Exempt Level 8).

20. Effective November 29, 1999, Plaintiff's pay increased 22%, from $10.50/hour to $12.81/hour, and her job grade was increased from 8N to 10N (Non-Exempt Level 10).

### *Mills Elects to Fill the Director's Position After Mathews' Employment Ends*

21. Mathews' employment with the Bank ended effective October 22, 2001.

22. Rather than fill the Production Manager position held by Mathews at the time his employment ended, Mills, who believed her schedule was such that she no longer had the time to directly

supervise the Department, elected to fill the Printing and Purchasing Director position with someone who could both perform the functions of the Production Manager (who was not being replaced) and function as the overall manager for the Department.

23. The new Director would report to Judy Mills. Plaintiff and Shepherd would report to the Director.

24. Prior experience managing and operating a print shop was essential to the Director position and Mills sought candidates who possessed this experience.

25. The qualifications for the Purchasing and Printing Director's position were stated as follows:

**Education and Experience**

> [1] Bachelor's Degree in Business Management or a technical degree in Graphics Art. Graphic Communication Manager certification required. [2] **Five to seven years experience in printing plant management and processing required.** [3] Two to three years of supervisory experience required. [4] Experience with word processing, spreadsheet, inventory control, print production and purchasing software applications required.

*Plaintiff Bids for the Director Position*

26. On March 11, 2002, Plaintiff forwarded her Job Bid Application for the Director's position to Deborah Huxford, a Recruiter in the Bank's Human Resources Department.

27. One of Huxford's responsibilities at that time was to screen the applications (from external candidates) and job bids (from internal candidates) to distinguish candidates who possessed only a limited portion of the objective qualifications for the job at issue from those who were qualified.

28. Huxford compared Plaintiff's qualifications to the qualifications required by the Director's position and determined that Plaintiff possessed few, if any, of the objective qualifications required for the position.

29. In particular, Huxford noted that Plaintiff did not have the required educational background, had no printing plant management experience and did not have two to three years of supervisory experience. Huxford did not forward Plaintiff's job bid to Mills for consideration because Plaintiff lacked all of these qualifications.

30. Huxford sent Plaintiff a memorandum on March 15, 2002 informing Plaintiff: "After reviewing your job bid application I have determined you do not meet the minimal qualifications for this position."

31. Plaintiff has a double Associate of Science degree in Accounting and Business Administration but she does not have a bachelor's degree.

32. Plaintiff had no print shop experience, much less any printing plant management experience or experience supervising printing plant employees. Plaintiff has never operated the printing press and pre-press film area and she has never worked on the sorter. Plaintiff cannot operate the press or shoot film and has no experience in either of these areas.

33. Plaintiff did not know who made the assessment that she was not qualified for the Director's position but she admits that she did not satisfy the requirements for the Director's position that are set forth in Huxford's memorandum.

34. Huxford did not know what Plaintiff's race was at the time she made the assessment that Plaintiff was not qualified.

35. Neither Andrea McCain nor Judy Mills played any role in Huxford's assessment that Plaintiff did not meet the minimum qualifications for the position.

*Selection of Craig Burkhalter*

36. No candidate fully satisfied the minimum qualifications for the Director's position.

37. Based on the need for a Director with significant experience in actual print plant operations because the Production Manager responsibilities were rolled into the Director's position, Mills selected Craig Burkhalter for the Director's position. Burkhalter was hired as the Purchasing and Printing Director effective June 24, 2002.

38. Burkhalter had worked in the printing field since 1971 and his prior printing experience included work as the Printing and Bindery Manager of Color Craft from February 1999 until May 2002, Print Shop Manager of Crown Printing from September 1998 until February 1999, and owner of Camellia Printing from December 1988 until June 1998.

39. Plaintiff admits that Burkhalter had more than 5 - 7 years of printing plant management experience.

40. The Director would not only have to supervise and understand the operation of the printing plant, but it also might be necessary for the selected candidate to actually operate the printing press at times. Burkhalter could operate a press because he did so in his previous positions.

*Plaintiff Would Not Have Been Selected by Mills*

41. In or about January 2002 and prior to opening the Director's position for bid, Mills considered whether any Department employee, including Plaintiff, was a suitable candidate for the Director position. Mills determined that none of the Department's employees was a suitable candidate for the position because no Department employee, including Plaintiff, had the necessary experience actually managing a print shop.

### *The Bank's Policies Prohibit Discrimination*

42. The Bank's Equal Employment Opportunity policy provides:

    **EQUAL EMPLOYMENT OPPORTUNITY**

    It is the policy of the Company to provide equal opportunity in employment to all employees and applicants for employment.  No person shall be discriminated against in employment because of such individuals' race, religion, color, sex, age, national origin, marital status, disability, veteran or citizenship status.

    This Policy applies to all terms, conditions, and privileges of employment, including hiring, probation, training and development, promotion, transfer, compensation, benefits, educational assistance, layoff and recall, social and recreational programs, termination and retirement.

43. Plaintiff received a copy of the Bank's policies prohibiting discrimination.

44. Plaintiff acknowledges that it is a violation of Bank policy not to report a claim of discrimination.  However, although she was aware of the policy, Plaintiff never complained to anybody within the Bank about allegations of discrimination.

45. Plaintiff acknowledged in her application for employment, as well as on each performance appraisal that she received, that she was aware of the Bank's policies prohibiting discrimination and that she should speak out to the equal opportunity coordinator if she thought there were problems.

46. Plaintiff has no complaints about any of the Colonial Bank policies related to discrimination, harassment, retaliation, EEO, tardiness, insufficient funds, and doesn't contend that any of the policies are discriminatory on their face.

47. Plaintiff is unaware of anybody ever losing their job because they complained about discrimination.

### *Plaintiff's Claims*

48. Plaintiff filed a charge of discrimination on July 9, 2002 and checked the boxes for race and sex discrimination, but she did not check retaliation. Plaintiff received the September 30, 2002 letter from Donald P. Burris of the EEOC setting forth the dismissal of her charge and notice of rights, and she understood that the EEOC concluded their investigation and had not found that Colonial had done anything wrong.

49. McCain and Mills are the only two people that Plaintiff contends discriminated against her.

50. Plaintiff complains about the 1999 decision because she erroneously believes that Mathews was given the salary and title associated with the Director's position.

51. Plaintiff complains about the 2002 decision because she (a) was required to assist Burkhalter and (b) because she had been performing a percentage of the Director's responsibilities.

52. There is no other position at Colonial Bank that Plaintiff wants. The Director of Purchasing was the only job that Plaintiff sought, and that job was never posted after Craig Burkhaulter left because it no longer exists. Plaintiff is well aware of the job bidding procedure at Colonial Bank, and, if she wanted to bid on other jobs, she should do so, but she has chosen not to do so.

53. Plaintiff never heard Mills say anything about race, including Plaintiff's race, that was inappropriate.

54. Plaintiff never heard McCain say anything about race, including Plaintiff's race, that was inappropriate.

55. Plaintiff also testified at her deposition that she first felt like she had been discriminated against in October 2000 when she was not given the Director's position.

15

56. The first time Plaintiff raised any issue of race or sex discrimination was when she filed her EEOC charge on or about July 9, 2002.

57. In sum, Defendant denies that it has discriminated against Plaintiff on any prohibited basis. Defendant denies that it has altered any document in violation of 18 U.S.C. § 1001. Defendant denies that Plaintiff was assigned most of the duties of Director and further denies that Plaintiff was qualified for that job.

5. **STIPULATIONS BY AND BETWEEN THE PARTIES:**

    It is ORDERED that:

    (1) The jury selection and trial of this cause, which is to last one (1) day, are set for August 8, 2005, at 10:00 a.m., in Courtroom 2E, Frank M. Johnson, Jr. Courthouse Complex, One Church Street, Montgomery, Alabama;

    (2) The parties are to file their pre-trial briefs, proposed jury selection questions, and proposed jury instructions by August 3, 2005;

    (3) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk),

three copies of the list of his or her exhibits;

(4) At least three days before trial, counsel are to contact the courtroom deputy clerk about the procedures for pre-marking all trial exhibits;

(5) Each party shall have available a sufficient number of copies of each photostatically reproducible exhibit for each of the jurors, opposing counsel, the courtroom deputy clerk, the law clerk, and the judge; and

(6) All understandings, agreements, and stipulations contained in this pretrial order shall be binding on all parties unless an objection is noted and filed with the court within seven (7) days from the date of this order.

DONE, this the 1st day of August, 2005.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE